**Terry MOORE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A04–0503–CR–137.

Court of Appeals of Indiana.

Dec. 1, 2005.

Transfer Denied Jan. 4, 2006.

Marshelle Dawkins Broadwell, Marion County Public Defender Agency, Appellate Division, Indianapolis, for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Terry Moore appeals his convictions for attempted murder, a class A felony, aggravated battery, a class B felony, and criminal confinement as a class B felony, as well as his adjudication as a habitual offender. We affirm.

### Issue

We restate the issue as whether the trial court abused its discretion in modifying

Moore's subpoena duces tecum ordering the production of his victim's complete confidential informant file.

### Facts and Procedural History

The facts most favorable to the jury's verdict indicate that on October 21 and 23, 2002, Indianapolis Police Department ("IPD") officers used John McGavock as a confidential informant to purchase cocaine from Moore. Moore was arrested and charged with two counts of class A felony dealing in cocaine. Moore was subsequently released pending trial, which was set for September 22, 2003.

On the evening of September 7, 2003, McGavock attended a birthday party in an apartment building near the intersection of East Washington Street and Highland Avenue. When McGavock went to another apartment to retrieve some food, two men burst in. McGavock was hit on the head with a gun and knocked to the floor. The men bound, gagged, and blindfolded McGavock and put him in the trunk of a car. The men drove to a gas station, opened the trunk, and saw that McGavock had untied his hands. They punched McGavock, retied his hands, and drove to a garage. McGavock, who had again untied his hands, was punched and "hog-tied" and left in the garage with Moore. Tr. at 182. By this time, McGavock had positioned the blindfold so that he could see. Moore eventually dragged McGavock out of the garage and into an upstairs bedroom closet in Moore's apartment.

McGavock untied his hands several times. Each time, Moore kicked and punched him and retied his hands. McGavock saw Moore watch TV, talk on the telephone, and fall asleep on the bed. McGavock untied his hands and feet, ran to the telephone, and attempted to dial 9–1–1. Moore awoke, ripped the telephone off the wall, and grabbed McGavock. McGavock yelled for help, and the two fought their way down the stairs. At the bottom of the stairs, Moore grabbed a knife and stabbed McGavock in the shoulder. Moore stabbed McGavock again, and the knife blade broke. Moore grabbed another knife and said, "I asked you if you was the police. You tell me you're not the police. You a C.I." *Id.* at 190. Moore stabbed McGavock in the neck and slashed his throat. McGavock fell to the floor and made a gurgling sound. Moore said, "Oh, you're not dead yet? You had better be dead by the time I get through cleaning this stuff up. Because if you're not dead, I am going to come over and cut your head off." *Id.* at 191. Moore then said, "I still hear you. I still hear you. You ain't dead yet. Just wait." *Id.* McGavock lost consciousness.

During the struggle, Moore's roommate, Edward Harper, awoke to hear an unfamiliar voice yelling, "Don't kill me. Don't kill me." *Id.* at 245. Harper hid in his closet. Fifteen minutes later, Moore entered Harper's room and said that he was getting ready to turn himself in. Moore told Harper not to come downstairs and left the room. Harper started to walk downstairs and saw blood on the couch. Harper went back upstairs, lowered himself from his bedroom window with an electrical cord, and asked a passerby to call the police.

At approximately 6:30 a.m. on September 8, 2003, IPD Officers Tracy Ryan and Ronald Rehmel responded to a 9–1–1 call regarding a possible disturbance at a residence on North Central Avenue. No one answered the door, and the officers departed. At approximately 7:30 a.m., the officers responded to a second 9–1–1 call at the residence and returned to find a "shaking, screaming" Harper standing on a balcony "saying that there was something going on" inside. *Id.* at 53. The officers entered the building and reached

Moore and Harper's apartment. The officers detected a strong odor of a cleaning solution.

Through a window in the apartment door, Officer Rehmel saw McGavock lying in a pool of blood. Moore walked toward the door. The officers drew their firearms and ordered him to unlock the door. Moore did so, and the officers entered and handcuffed him. Moore was uninjured, and his clothing and shoes were soaked with blood. Officer Tracy saw a mop and a bucket of soapy water in the room. Officer Tracy read Moore his *Miranda* rights, and he stated that he understood them. The officers requested medical assistance for McGavock.

After McGavock was taken to the hospital, Moore asked to speak with Officer Tracy. He told her that if she wrote anything down, "he would deny it all." *Id.* at 71. He told her that he had first intended to shoot McGavock, but then decided to "saw his head off." *Id.* at 72. When asked why he had harmed McGavock, Moore stated that McGavock had come over to sell him a gun and that they had gotten into an argument over a previous drug case. Moore said that McGavock became upset when he refused to buy the gun and struck him with the weapon. Moore stated that he wrested the gun from McGavock and hid it in an upstairs bedroom. He decided that he did not want to shoot McGavock and instead stabbed him with a knife and "was just going to cut him until his head came off." *Id.* at 75.

Police found a knife handle and knife blades in the apartment, as well as blood spatters on the living room and stairway walls. Bloody footprints were found upstairs and in the kitchen. Police also found a handgun under the bed in an upstairs bedroom and red smears on a telephone next to the bed. On the bed was a pile of clothing that appeared to have been removed from the closet.

McGavock received treatment for multiple knife wounds, the most significant of which "spanned the entire front of the neck" and "went deep into the throat[,]" damaging part of the airway. *Id.* at 91, 92. McGavock was in danger of suffocating and of drowning from blood seeping into the airway. The trauma physician gave McGavock a fifty percent chance of survival. McGavock was unable to talk for several days and identified Moore as his assailant from a photo array. On September 16, McGavock told police for the first time about the ropes involved in his abduction. Police found a rope and a rag under Harper's bed and a rope and a cloth in the garage, all of which appeared to be covered with blood. Police also found McGavock's car near the intersection of East Washington Street and Highland Avenue.

The State charged Moore with attempted murder, a class A felony; aggravated battery, a class B felony; criminal confinement as a class B felony; battery as a class C felony; and carrying a handgun without a license as a class A misdemeanor. The State also alleged Moore to be a habitual offender. Moore filed a subpoena duces tecum ordering IPD to produce McGavock's complete confidential informant file, including any agreements between him and IPD, his payment ledger, a list of the cases he had worked on, and records regarding whether the information he provided "resulted in an arrest, a charge, a conviction or an acquittal." Appellant's App. at 231. IPD filed a motion to quash the subpoena. The trial court conducted an *in camera* review of McGavock's file and ordered IPD to produce the documents and records relating to this case and McGavock's alleged purchases of cocaine from Moore in 2002.

At trial, Moore renewed his request for production of McGavock's complete file and moved to exclude McGavock's testimony because he had been unable to review it. The trial court denied both motions. Moore testified that McGavock came to his house and attempted to sell him a gun; when he refused to purchase it, McGavock punched him, grabbed a knife, and chased him around a table. Moore stated that he grabbed a knife and fought back, and when he "came to[,]" he was sitting on McGavock's back and "had the knife ... in a sawing motion" under his neck. Tr. at 472. On January 20, 2005, the jury found Moore guilty of attempted murder, aggravated battery, and criminal confinement, and not guilty of the remaining charges. The jury then found Moore to be a habitual offender. At the sentencing hearing, the trial court vacated the aggravated battery conviction on double jeopardy grounds and imposed a total executed sentence of eighty-five years. Moore now appeals.

### Discussion and Decision

■ Moore challenges the trial court's modification of his subpoena duces tecum. A trial court has broad discretion with regard to rulings on discovery matters based upon its duties to promote discovery of the truth and to guide and control the proceedings. *Miller v. State*, 825 N.E.2d 884, 888 (Ind.Ct.App.2005), *trans. denied*. "Therefore, such rulings will be overturned only for an abuse of discretion. An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court." *Id.* (citation omitted); *see also Sweeney v. State*, 704 N.E.2d 86, 108 (Ind.1998) ("The decision to enforce, modify, or quash a subpoena duces tecum is a question for the trial court and will not be disturbed unless the decision is clearly arbitrary.") (citation and quotation marks omitted), *cert. denied*. Due to the fact-

sensitive nature of discovery matters, the trial court's ruling is cloaked in a strong presumption of correctness on appeal. *Williams v. State*, 819 N.E.2d 381, 384 (Ind.Ct.App.2004), *trans. denied* (2005). "We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though this was not the reason enunciated by the trial court." *Id.* at 384–85.

■ To determine if information sought in criminal cases is properly discoverable, courts consider the following factors:

(1) there must be a sufficient designation of the items sought to be discovered (particularity); (2) the items requested must be material to the defense (relevance); and (3) if the particularity and materiality requirements are met, the trial court must grant the request unless there is a showing of "paramount interest" in non-disclosure.

*Id.* at 385 (quoting *In re WTHR–TV*, 693 N.E.2d 1, 6 (Ind.1998)). We agree with Moore that his subpoena was sufficiently particular as to the items sought to be discovered. We therefore turn our attention to considerations of relevance and paramount interest in non-disclosure of the items.

■ "An item is 'material' if it appears that it might benefit the preparation of the defendant's case." *In re WTHR–TV*, 693 N.E.2d at 7. Our supreme court has explained that the term "paramount interest"

suggests that some fundamental and important stake is required to resist discovery. However, the depth of the interest in resisting may be no more than inconvenience if the need for it from a given source is minimal—for example, because it is readily available elsewhere without need to drag third parties into court. Whether a sufficient interest has been shown to prevent discovery will

depend upon the type of interest put forth and the category of information sought. A legitimate interest in keeping the information or items confidential, for example, may suffice to deny discovery. Ultimately these factors [i.e., particularity, relevance, and paramount interest in non-disclosure] involve a balancing test that includes evaluation of the relevance of the material, its availability from other sources, the burden of compliance measured in terms of difficulty, and the nature and importance of any interests invaded.

*Id.* at 7–8 (citations and quotation marks omitted).

■ Moore first claims that he "needed a complete confidential informant payment ledger showing all McGavock's payments over the years of his employment by the police for the purpose of fully showing the level of his dependence on the money he received, which goes directly to bias and motive." Appellant's Br. at 16. Moore was able to accomplish this purpose on cross-examination by establishing that McGavock's only sources of income were his confidential informant payments and disability pension. *See* Tr. at 218–19.

Next, Moore asserts that he should have been given "[d]ocuments showing the accuracy of the information McGavock was passing to the police" to establish "both Moore's and McGavock's motives." Appellant's Br. at 18. He also claims that evidence "that McGavock's information often failed to result in a conviction or that McGavock systematically made false accusations against friends, family and acquaintances of Moore could have seriously af-

fected the outcome of Moore's trial." *Id.* We are unable to discern the relevance of McGavock's track record as a confidential informant to Moore's motive in this case; Moore claimed that he stabbed McGavock in self-defense after an unsuccessful gun deal, not in retaliation for false accusations against himself or others. Also, Moore could have attempted to depose McGavock's IPD contacts to obtain this information.[1]

Moore also asserts that "he needed McGavock's entire confidential informant file to discover whether or not McGavock had, over the years, conformed to his agreement" with IPD not to engage in illegal activity. *Id.* at 19. Moore states that "McGavock was the essential witness for two cases in which he had accused Moore of dealing in cocaine" and baldly asserts that "[i]f McGavock's file contained information that police believed he was involved in similar activity, that information would have been both material and admissible." *Id.* Here again, Moore could have interviewed McGavock's IPD contacts to obtain this information.

Finally, Moore claims that "McGavock's entire file was necessary to impeach McGavock on the extent of his work as a confidential informant" and that he was "entitled to impeach McGavock on any prior inconsistent statements." *Id.* (citing Ind. Evidence Rule 613). The only trial testimony to which Moore refers concerns McGavock's tenure as a confidential informant and the generalities of his work, both of which easily could have been verified by an IPD detective. As was the case in *United States v. Bastanipour*, 41 F.3d 1178 (7th Cir.1994), Moore's request to

**1.** Moore cites *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), for the proposition that "[i]nformation regarding prior or contemporaneous perjury or bizarre testimony of an informant is discoverable." Appellant's Br. at 18. We find *Mesarosh* in-

applicable because there is no indication that the State withheld such information here. Additionally, we note that Moore's testimony, rather than McGavock's, must be considered bizarre in light of the evidence adduced at trial.

review McGavock's complete file "was based on nothing more than his speculation that the file might contain evidence which he could use to impeach" McGavock. *Id.* at 1181. We agree with the State that IPD had a paramount interest in not disclosing McGavock's work in other cases to "avoid the kind of retaliation that happened in this case." Appellee's Br. at 10.[2] In sum, we conclude that the trial court did not abuse its discretion in limiting the scope of Moore's fishing expedition.

Moore also renews several constitutional claims that he made at trial. As for his argument that the trial court's ruling violated his right to confrontation under the Sixth Amendment to the United States Constitution,[3] we note that the Confrontation Clause "is not a constitutionally compelled rule of pretrial discovery." *Rubalcada v. State*, 731 N.E.2d 1015, 1021 (Ind.2000) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). "It only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* (quoting *Ritchie*, 480 U.S. at 53, 107 S.Ct. 989). "The ability to question adverse witnesses ... does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Ritchie*, 480 U.S. at 53, 107 S.Ct. 989 (footnote omitted). Moore was able to cross-examine McGavock effectively and at length regarding his credibility, memory, and potential bias as a paid

police informant. *See* Tr. at 199–223. We find no violation here.

Article 1, Section 13 of the Indiana Constitution gives an accused the right "to meet the witnesses face to face[.]" Our supreme court has stated that

Indiana's confrontation right contains both the right to cross-examination and the right to meet the witnesses face to face. It places a premium upon live testimony of the State's witnesses in the courtroom during trial, as well as upon the ability of the defendant and his counsel to fully and effectively probe and challenge those witnesses during trial before the trier of fact through cross-examination. The defendant's right to meet the witnesses face to face has not been subsumed by the right to cross-examination. That is to say, merely ensuring that a defendant's right to cross-examine the witness is scrupulously honored does not guarantee that the requirements of Indiana's Confrontation Clause are met.

*Brady v. State*, 575 N.E.2d 981, 988 (Ind. 1991). Here, the record shows that Moore met McGavock face to face and fully and effectively probed and challenged him through cross-examination.

Moore also contends that he was denied due process of law under the Fourteenth Amendment, claiming that the trial court's ruling resulted in the suppression of material evidence favorable to him. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request vio-

---

**2.** Moore disputes the existence of a paramount interest in non-disclosure and argues that "anyone who had sold McGavock drugs and had subsequently been charged with dealing in drugs would know McGavock was responsible." Appellant's Br. at 15, 16. Moore's argument assumes that those dealers sold drugs only to McGavock (or were arrest-

ed immediately thereafter) and that his identity was not kept confidential.

**3.** The Sixth Amendment states in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]"

lates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Moore's argument begs the question of whether the evidence at issue was both favorable and material. Ultimately, the fact that the State submitted McGavock's file to the trial court for *in camera* review "negates any argument that the government suppressed favorable or material information." *Bastanipour,* 41 F.3d at 1182.[4] We therefore affirm Moore's convictions.

Affirmed.

NAJAM, J., and BARNES, J., concur.

---

4. Moore also contends that he was denied due course of law under Article 1, Section 12 of the Indiana Constitution. Our supreme court has held that "the Due Course of Law provision is applicable to civil proceedings, but provides none of the criminal protections of its federal counterpart[,]" i.e., the Due Process clause. *Sanchez v. State,* 749 N.E.2d 509, 514 (Ind.2001). Moore acknowledges this but nevertheless urges that "the due course provision should be applicable to the criminally accused." Appellant's Br. at 24. It is well settled that "[w]e are bound by the decisions of our supreme court." *Dragon v. State,* 774 N.E.2d 103, 107 (Ind.Ct.App.2002), *trans. denied* (2003).