## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 26 2015, 8:57 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Victoria Christ
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Terry Moore,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

October 26, 2015

Court of Appeals Case No.
49A05-1504-PC-159

Appeal from the Marion Superior Court

The Honorable Stanley E. Kroh, Judge Pro Tempore

Trial Court Cause No.
49G03-0309-PC-152666

**Najam, Judge.**

# Statement of the Case

Terry Moore appeals the post-conviction court's denial of his amended petition for post-conviction relief. Moore presents a single issue for our review, namely, whether he was denied the effective assistance of appellate counsel. We affirm.

# Facts and Procedural History

We summarized the facts and procedural history of this case in Moore's direct appeal, *Moore v. State*, 839 N.E.2d 178, 180-82 (Ind. Ct. App. 2005), *trans. denied*, as follows:

> The facts most favorable to the jury's verdict indicate that on October 21 and 23, 2002, Indianapolis Police Department ("IPD") officers used John McGavock as a confidential informant to purchase cocaine from Moore. Moore was arrested and charged with two counts of class A felony dealing in cocaine. Moore was subsequently released pending trial, which was set for September 22, 2003.
>
> On the evening of September 7, 2003, McGavock attended a birthday party in an apartment building near the intersection of East Washington Street and Highland Avenue. When McGavock went to another apartment to retrieve some food, two men burst in. McGavock was hit on the head with a gun and knocked to the floor. The men bound, gagged, and blindfolded McGavock and put him in the trunk of a car. The men drove to a gas station, opened the trunk, and saw that McGavock had untied his hands. They punched McGavock, retied his hands, and drove to a garage. McGavock, who had again untied his hands, was punched and "hog-tied" and left in the garage with Moore. Tr. at 182. By this time, McGavock had positioned the blindfold so that he could see. Moore eventually dragged

McGavock out of the garage and into an upstairs bedroom closet in Moore's apartment.

McGavock untied his hands several times. Each time, Moore kicked and punched him and retied his hands. McGavock saw Moore watch TV, talk on the telephone, and fall asleep on the bed. McGavock untied his hands and feet, ran to the telephone, and attempted to dial 9-1-1. Moore awoke, ripped the telephone off the wall, and grabbed McGavock. McGavock yelled for help, and the two fought their way down the stairs. At the bottom of the stairs, Moore grabbed a knife and stabbed McGavock in the shoulder. Moore stabbed McGavock again, and the knife blade broke. Moore grabbed another knife and said, "I asked you if you was the police. You tell me you're not the police. You a C.I." *Id.* at 190. Moore stabbed McGavock in the neck and slashed his throat. McGavock fell to the floor and made a gurgling sound. Moore said, "Oh, you're not dead yet? You had better be dead by the time I get through cleaning this stuff up. Because if you're not dead, I am going to come over and cut your head off." *Id.* at 191. Moore then said, "I still hear you. I still hear you. You ain't dead yet. Just wait." *Id.* McGavock lost consciousness.

During the struggle, Moore's roommate, Edward Harper, awoke to hear an unfamiliar voice yelling, "Don't kill me. Don't kill me." *Id.* at 245. Harper hid in his closet. Fifteen minutes later, Moore entered Harper's room and said that he was getting ready to turn himself in. Moore told Harper not to come downstairs and left the room. Harper started to walk downstairs and saw blood on the couch. Harper went back upstairs, lowered himself from his bedroom window with an electrical cord, and asked a passerby to call the police.

At approximately 6:30 a.m. on September 8, 2003, IPD Officers Tracy Ryan and Ronald Rehmel responded to a 9-1-1 call regarding a possible disturbance at a residence on North Central Avenue. No one answered the door, and the officers departed.

At approximately 7:30 a.m., the officers responded to a second 9-1-1 call at the residence and returned to find a "shaking, screaming" Harper standing on a balcony "saying that there was something going on" inside. *Id.* at 53. The officers entered the building and reached Moore and Harper's apartment. The officers detected a strong odor of a cleaning solution.

Through a window in the apartment door, Officer Rehmel saw McGavock lying in a pool of blood. Moore walked toward the door. The officers drew their firearms and ordered him to unlock the door. Moore did so, and the officers entered and handcuffed him. Moore was uninjured, and his clothing and shoes were soaked with blood. Officer Tracy saw a mop and a bucket of soapy water in the room. Officer Tracy read Moore his *Miranda* rights, and he stated that he understood them. The officers requested medical assistance for McGavock.

After McGavock was taken to the hospital, Moore asked to speak with Officer Tracy. He told her that if she wrote anything down, "he would deny it all." *Id.* at 71. He told her that he had first intended to shoot McGavock, but then decided to "saw his head off." *Id.* at 72. When asked why he had harmed McGavock, Moore stated that McGavock had come over to sell him a gun and that they had gotten into an argument over a previous drug case. Moore said that McGavock became upset when he refused to buy the gun and struck him with the weapon. Moore stated that he wrested the gun from McGavock and hid it in an upstairs bedroom. He decided that he did not want to shoot McGavock and instead stabbed him with a knife and "was just going to cut him until his head came off." *Id.* at 75.

Police found a knife handle and knife blades in the apartment, as well as blood spatters on the living room and stairway walls. Bloody footprints were found upstairs and in the kitchen. Police also found a handgun under the bed in an upstairs bedroom and red smears on a telephone next to the bed. On the bed was a pile of clothing that appeared to have been removed from the closet.

McGavock received treatment for multiple knife wounds, the most significant of which "spanned the entire front of the neck" and "went deep into the throat[,]" damaging part of the airway. *Id.* at 91, 92. McGavock was in danger of suffocating and of drowning from blood seeping into the airway. The trauma physician gave McGavock a fifty percent chance of survival. McGavock was unable to talk for several days and identified Moore as his assailant from a photo array. On September 16, McGavock told police for the first time about the ropes involved in his abduction. Police found a rope and a rag under Harper's bed and a rope and a cloth in the garage, all of which appeared to be covered with blood. Police also found McGavock's car near the intersection of East Washington Street and Highland Avenue.

The State charged Moore with attempted murder, a class A felony; aggravated battery, a class B felony; criminal confinement as a class B felony; battery as a class C felony; and carrying a handgun without a license as a class A misdemeanor. The State also alleged Moore to be a habitual offender. Moore filed a subpoena duces tecum ordering IPD to produce McGavock's complete confidential informant file, including any agreements between him and IPD, his payment ledger, a list of the cases he had worked on, and records regarding whether the information he provided "resulted in an arrest, a charge, a conviction or an acquittal." Appellant's App. at 231. IPD filed a motion to quash the subpoena. The trial court conducted an *in camera* review of McGavock's file and ordered IPD to produce the documents and records relating to this case and McGavock's alleged purchases of cocaine from Moore in 2002.

At trial, Moore renewed his request for production of McGavock's complete file and moved to exclude McGavock's testimony because he had been unable to review it. The trial court denied both motions. Moore testified that McGavock came to his house and attempted to sell him a gun; when he refused to purchase it, McGavock punched him, grabbed a knife,

and chased him around a table. Moore stated that he grabbed a knife and fought back, and when he "came to[,]" he was sitting on McGavock's back and "had the knife . . . in a sawing motion" under his neck. Tr. at 472. On January 20, 2005, the jury found Moore guilty of attempted murder, aggravated battery, and criminal confinement, and not guilty of the remaining charges. The jury then found Moore to be a habitual offender. At the sentencing hearing, the trial court vacated the aggravated battery conviction on double jeopardy grounds and imposed a total executed sentence of eighty-five years.

In his direct appeal, Moore raised a single issue, namely, whether the trial court abused its discretion when it modified Moore's subpoena *duces tecum* ordering the production of his victim's complete confidential informant file. *Id.* at 179-80. We affirmed Moore's convictions. *Id.* at 185.

[3] In October 2011, Moore filed a pro se petition for post-conviction relief, and in July 2013, Moore filed an amended petition alleging that his appellate counsel was ineffective when she did not raise on appeal the issue of whether Moore's Class B felony criminal confinement conviction violated the prohibition against double jeopardy. Following a hearing, the post-conviction court denied Moore's petition. This appeal ensued.

# Discussion and Decision

[4] Moore appeals the post-conviction court's denial of his amended petition for post-conviction relief. Our standard of review is clear:

> [The petitioner] bore the burden of establishing the grounds for post-conviction relief by a preponderance of the evidence. *See*

Ind. Post-Conviction Rule 1(5); *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001). Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available. *Timberlake*, 753 N.E.2d at 597. Rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. *Id.* If an issue was known and available, but not raised on direct appeal, it is waived. *Id.* If it was raised on appeal, but decided adversely, it is res judicata. *Id.*

In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting the post-conviction court's judgment. *Hall v. State*, 849 N.E.2d 466, 468 (Ind. 2006). The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. *Id.* at 468-69. Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues [the petitioner] must convince this court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *See Timberlake*, 753 N.E.2d at 597. We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the post-conviction court. *Id.*

*Lindsey v. State*, 888 N.E.2d 319, 322 (Ind. Ct. App. 2008), *trans. denied*.

[5] Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). "Although we do not defer to the post-conviction court's legal conclusions, '[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.'" *Overstreet v. State*, 877 N.E.2d 144, 151 (Ind. 2007) (citation omitted).

Moore contends that he was denied the effective assistance of appellate counsel in violation of the Sixth Amendment to the United States Constitution. A claim of ineffective assistance of counsel must satisfy two components. *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687-88. Second, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694.

Moore asserts that his appellate counsel's performance was deficient because she did not raise as an issue on direct appeal that Moore's Class B felony criminal confinement conviction violated the prohibition against double jeopardy. Our supreme court has stated that the decision regarding what issues to raise and what arguments to make is one of the most important strategic decisions to be made by appellate counsel, and, thus, ineffectiveness is "very rarely found" on that basis. *See Conner v. State*, 711 N.E.2d 1238, 1252 (Ind. 1999) (citations omitted). "'Accordingly, when assessing these types of ineffectiveness claims, reviewing courts should be particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable.'" *Id.* (quoting *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997)). To evaluate the performance prong when counsel waived issues upon appeal, we apply the following test: (1)

whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013) (citing *Timberlake*, 753 N.E.2d at 605-06). If the analysis under this test demonstrates deficient performance, then we evaluate the prejudice prong which requires an examination of whether the issues appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id.*

[8] Here, at trial, Moore's trial counsel argued to the court that there was a reasonable possibility that the jury relied on the same evidence, namely, the serious bodily injuries sustained by McGavock, both to enhance Moore's criminal confinement conviction to a Class B felony and to convict Moore of attempted murder. Thus, Moore's trial counsel argued that, under the actual evidence test set out in *Richardson v. State,* 717 N.E.2d 32 (Ind. 1999), double jeopardy principles required that his Class B felony criminal confinement conviction be reduced to a Class D felony. *See, e.g.*, *Ramon v. State*, 888 N.E.2d 244, 253 (Ind. Ct. App. 2008) (noting that, where one conviction is elevated to a Class A felony based on the same bodily injury that forms the basis of another conviction, the two cannot stand).

[9] Our supreme court has explained the actual evidence test as follows:

> [T]he Double Jeopardy Clause of the Indiana Constitution . . . provides "[n]o person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. In *Richardson*[*, 717 N.E.2d at 49*], this Court concluded that two or more offenses are the same offense in violation of article 1, section 14 if, with respect to

either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense. Under the actual evidence test, we examine the actual evidence presented at trial in order to determine whether each challenged offense was established by separate and distinct facts. *Id.* at 53. To find a double jeopardy violation under this test, we must conclude that there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." *Id.* The actual evidence test is applied to all the elements of both offenses. "In other words . . . the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." *Spivey v. State,* 761 N.E.2d 831, 833 (Ind. 2002).

Our precedents "instruct that a 'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility." *Lee v. State,* 892 N.E.2d 1231, 1236 (Ind. 2008) (citing cases). The reasonable possibility standard "fairly implements the protections of the Indiana Double Jeopardy Clause and also permits convictions for multiple offenses committed in a protracted criminal episode when the case is prosecuted in a manner that insures that multiple guilty verdicts are not based on the same evidentiary facts." *Richardson,* 717 N.E.2d at 53 n.46. The existence of a "'reasonable possibility' turns on a practical assessment of whether the [fact finder] may have latched on to exactly the same facts for both convictions." *Lee,* 892 N.E.2d at 1236. *We evaluate the evidence from the jury's perspective and may consider the charging information, jury instructions, and arguments of counsel. Id.* at 1234.

*Garrett*, 992 N.E.2d at 719-20 (emphasis added).

At trial, the jury was instructed that Moore was alleged to have committed attempted murder when he stabbed

> at and against the person of John McGavock with a deadly weapon, that is: a knife, with the intent to kill John McGavock, resulting in serious bodily injury, that is: stab wounds of the chest, abdomen, shoulders, and back; and lacerations of the neck[;] . . . which was conduct constituting a substantial step toward the commission of the intended crime of killing John McGavock.

Appellant's App. at 172. And the jury was instructed on the criminal confinement charge as follows:

> A person who knowingly *removes* another person by fraud, enticement, force or threat of force, *from one place to another* commits criminal confinement, a Class D felony.
>
> *The offense is a Class B felony if it is committed while armed with a deadly weapon or if it results in serious bodily injury to another person.*
>
> Before you may convict the defendant, the State must have proved each of the following beyond a reasonable doubt:
>
> 1. The defendant, Terry A. Moore
>
> 2. Knowingly or intentionally
>
> 3. *Removed John McGavock* by fraud, enticement, force or threat of force from one place to another, that is: *from a residence located near the intersection of Washington Street and Highland Avenue, to a residence located at 2060 North Central Avenue*
>
> 4. *And the defendant committed the removal while armed with a deadly weapon, that is a handgun;*

*or*

> *the removal resulted in serious bodily injury to John McGavock, that is: stab wounds of the chest, abdomen, shoulders and back and lacerations of the neck[.]*

*Id.* at 174 (emphases added). Thus, Moore's criminal confinement charge was based solely on his conduct in removing McGavock from one residence to another and not on his subsequent conduct. *See* Ind. Code § 35-42-3-3(a)(2) (2002).[1] And the jury was instructed that it could convict Moore of Class B felony criminal confinement either if he used a handgun in the course of the removal *or* if the removal resulted in serious bodily injury, namely, stab wounds and lacerations.

[11] The evidence presented at trial left no room for confusion on this issue. Again, Moore was charged with confining McGavock by moving him from one place to another. McGavock testified in relevant part as follows:

> When I got to the back room, two guys busted through the back door. *I was hit on the head with a gun*, knocked on the floor. One guy ran around and grabbed me by the throat, put a gun in my mouth. The other guy was kicking me.
>
> At that time, they turned me over and tied my hands up. They . . . tied my hands behind my back, tied my feet up, put a rag in my mouth, tied something around the back of my mouth

---

[1] Indiana Code Section 35-42-3-3 was substantively amended in 2014.

and around my eyes and told me to shut up, don't move, don't scream, don't yell.

Trial Tr. at 179 (emphasis added). The men then put McGavock into the trunk of a car and drove him to Moore's apartment. At no time during that confinement was McGavock stabbed or cut with a knife. Rather, McGavock's testimony shows that Moore and the other man used a gun in the course of the confinement. Moore stabbed and cut McGavock, causing serious bodily injuries, long after that initial confinement and only after McGavock had tried to escape. Accordingly, the jury instructions and the actual evidence demonstrate that there is no reasonable possibility that the jury enhanced Moore's criminal confinement conviction based on McGavock's serious bodily injuries. As such, there was no double-jeopardy issue for his appellate counsel to have raised.

[12] But Moore insists that the jury acquitted him of battery, as a Class C felony, which was based on his alleged use of a handgun to hit McGavock, and the jury also acquitted Moore of carrying a handgun without a license. Moore asserts that

> [t]he jury spoke by its verdict that the State failed to prove Moore hit McGavock with the gun. The jury spoke by finding the State never proved Moore possessed a gun on the date of the crime. The jury's finding can only be explained by the victim's inability to identify Moore as the person who hit [McGavock] with the gun at the first location. McGavock described being hit in the head with the gun one time but he was unable to identify the person who hit him. When he got to the garage on Central Avenue, the blindfold was removed but he was unable to see

Moore because he had blood in his eyes, and this incident did not involve a gun. *Since the jury consistently acquitted Moore of the gun-related charges, it would be unreasonable to assume the jury relied on the deadly weapon alternative of the confinement count to reach the Class B felony conviction instead of the serious bodily injury alternative.*

Appellant's Br. at 20-21 (emphasis added).

[13] But, as the State contends, any inconsistencies in the verdict have no bearing on the issue before us. Indeed, our supreme court has stated that,

> [w]hen a jury returns logically inconsistent verdicts, such a result could mean that it misunderstood its instructions. But it is more likely that the jury chose to exercise lenity, refusing to find the defendant guilty of one or more additionally charged offenses, even if such charges were adequately proven by the evidence. Such right of a criminal jury to decline to convict is well recognized.

*Beattie v. State*, 924 N.E.2d 643, 648 (Ind. 2010). Thus, just because the jury acquitted Moore of the gun-related charges, that does not necessarily mean that they also concluded that the criminal confinement was not accomplished with the use of a firearm.

[14] Given the jury instructions and the evidence presented at trial, which left no doubt that McGavock did not sustain any stab wounds or cuts during the criminal confinement, we cannot say that there is "substantially more than a logical possibility" that the jury relied on the stab and knife cut wounds to McGavock to elevate the criminal confinement conviction to a Class B felony. *Garrett*, 992 N.E.2d at 719. Because there was no double jeopardy violation,

Moore has not demonstrated either that his double jeopardy claim was "significant and obvious from the face of the record" or "clearly stronger" than the issue counsel raised on direct appeal. *Id.* at 724. Thus, Moore has not shown that his appellate counsel's performance was deficient. *Id.* Again, we are "'particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable.'" *Conner*, 711 N.E.2d at 1252 (quoting *Bieghler*, 690 N.E.2d at 194). The post-conviction court did not err when it denied Moore's petition for post-conviction relief alleging ineffective assistance of appellate counsel.

[15] Affirmed.

Kirsch, J., and Barnes, J., concur.